**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**SPARTANBURG DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No.: 7:23-cr-00456-TMC-2 |
| | ) | |
| v. | ) | **SETENCING MEMORANDUM AND** |
| | ) | **MOTION FOR DOWNWARD** |
| DAQUASIA CATHERINE MERCADO | ) | **VARIANCE** |
| | ) | |

**I.     Introduction**

More often than not, family is our biggest influence. It shapes what we believe, who we become, and how we behave. Our families can spur us on to great things or lead us down a path of destruction. They can help us find clarity or make things a mess. While the facts of this case aren't murky—it's pretty clear what happened—they are messy. For Daquasia Mercado, this case is all about family. Her co-defendants are her sister and her sister's significant other. And Daquasia's criminal conduct always involved a family member. At the time of her offenses, Daquasia was four months removed from her twenty-first birthday. She had never been arrested and had never possessed, purchased, or owned a firearm. All of that changed in 2020. To be clear, Daquasia doesn't blame her family for the decisions that she made and the actions that she took. She has candidly admitted to what she did and acknowledged that it was against the law. *See* Presentence Investigation Report (PSR) ¶¶ 28, 31, 37. But the why and how of what brought her into the criminal legal system is a story of family.

**II.     Legal Framework**

"As a matter of administration and to secure nationwide consistency," correctly calculating the United States Sentencing Commission Guidelines ("USSG" or the "Guidelines") range is the starting point of the federal sentencing process. *Gall v. United*

1

*States*, 552 U.S. 38, 50 (2007). However, the Guidelines range is "one factor among several" to be considered in imposing an appropriate sentence under 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). The Guidelines are not mandatory, *Gall*, 552 U.S. at 59, and the Court should not "presume that the Guidelines range is reasonable," *id.* at 50. *See also Rita v. United States*, 551 U.S. 338, 351 (2007) (stating that district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations"). Instead, the Court must consider all the § 3553(a) factors and "make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. Such consideration is necessary for the Court to fulfill its "overarching duty under § 3553(a) 'to impose a sentence sufficient, but not greater than necessary[]' to comply with the sentencing purposes set forth in § 3553(a)(2)." *Pepper v. United States*, 562 U.S. 476, 491 (2011).

### III.    The History and Characteristics of the Defendant

While she was growing up, Daquasia says her family "always struggled" and "moved from house to house." Her mother "made sure we had a place to stay and had food," but because they moved so often, Daquasia also changed schools a lot. When Daquasia was four, her mother and stepfather moved to South Carolina for a fresh start. At the time, Daquasia had five siblings. Daquasia's father was in prison for most of her early childhood; she met him for the first time when she was twelve. After he was released, Daquasia's family moved back to New York for about a year to reconnect with him, though they didn't establish a "close" relationship until Daquasia was an adult. However, he wasn't able to provide financial support at that time, and their family had to stay in a shelter until Daquasia's mother was able to receive government assistance for housing. But again, they moved back to South Carolina. This time without a place to live. A family friend took them in, and later a church provided a home for Daquasia's family. For some time, Daquasia's family didn't have lights or water. A Mexican family across the street would let them come over to take baths and

wash dishes. Later, Daquasia's mom was able to get a job. Daquasia remembers that "we got furniture and things started getting better."

But, when Daquasia was thirteen, she was sexually assaulted by her older sister's twenty-one-year-old boyfriend. Daquasia didn't disclose the assault to her family until she was fifteen-years old. About a year after the assault, when Daquasia was fourteen years old, she became pregnant with her first child. She was in eighth grade. The father of her child was in tenth grade. Looking back on it, Daquasia says, "I just didn't know what I was doing," which makes perfect sense given her age. When Daquasia's daughter was three-months old, the child's father went to prison and so did her brother, Corey. Two years later, when Daquasia was sixteen years old, her family moved back to New York. They moved back to South Carolina a year later when Daquasia was seventeen years old.

Shortly after moving back to Union, Daquasia's daughter's father was released from prison, and he moved in with Daquasia's family. Sadly, he physically abused Daquasia. After the second time, Daquasia and her mother moved in with Destiny. By that time, Daquasia was pregnant again, which she didn't realize until she was six months along. Daquasia had been playing lacrosse, which she loved, but had to stop after finding out she was pregnant. She also dropped out of school. Daquasia tried to maintain a relationship with her children's father for their sake, but it ended with law enforcement involvement because he wouldn't leave Daquasia's home. He now has no contact with their children and doesn't provide any support to Daquasia.

Being a mother is the most important thing to Daquasia. She gave birth to her third child in 2019 when she was twenty-years old. She's still in a relationship with the father of her youngest child. Daquasia describes the relationship as "much healthier" than what she's experienced in the past. *See* Exhibit 1, Tyrekius Garrett Letter to the Court. They live together and he helps financially support the family. He graduated from Dorman High School

3

and encourages Daquasia to finish school. He's also a "good father" to all of Daquasia's children. Daquasia's children are the "best thing" in her life—and they love her how only children can. *See* Exhibit 2, Support Letters from Daquasia's Children. She's had difficulty keeping jobs because of her responsibilities taking care of her children. And her employment options are limited because she didn't finish high school. Getting her GED is something she's attempted in the past—she tried to do it in New York in 2021, *see* Mercado005912-3 at 16:15—and still wants to pursue it now that her youngest child is older. In her own words, Daquasia knows there is no excuse for breaking the law. *See* Exhibit 3, Daquasia Mercado Letter to the Court. Now, Daquasia is "just trying to do right by everybody especi[a]lly my kids[;] they are everything to me." *Id.*



Daquasia and her parents







Daquasia and her children, and partner Tyrekius

## IV.     The Nature and Circumstances of the Offense

In 2019, Daquasia moved back to New York. Prior to the events in this case in 2020, Daquasia reports being "very close" with Destiny. They had always "bumped heads," but would always work things out eventually. For example, Destiny allowed Daquasia and their mother to live with Destiny and her husband. But, she tried to keep Daquasia's first child because she believed that Daquasia was too young to be a mother (which Daquasia doesn't disagree with, but says that she had to be a mother to her child). After Daquasia became pregnant with her second child, Destiny kicked Daquasia out.

In June 2020, Destiny moved to New York with her children. Mercado_000037 at 12:25–12:50. She met their codefendant, Ruben, "on a dating app." Mercado_000037 at 15:30-36. According to Daquasia and Destiny's mother, Destiny "changed" after meeting Ruben. Daquasia too says that Destiny "was a whole different person" after she met Ruben. Mercado_000037 at 27:17-22. For example, Destiny would tell them she was coming home,

6

but never did. When Destiny first met Ruben, her kids were "always with" Daquasia. One time, Destiny she left her kids with Daquasia for a month without visiting or checking on them. Mercado_000037 at 30:18-32. Destiny came to get her children after finding a place to live with Ruben. Soon after Destiny moved in with Ruben, Destiny asked Daquasia to ride to Spartanburg with Destiny to buy a gun. At first, Daquasia said "no" because she had never bought a gun before. But, she suspected that Ruben was abusing Destiny because she seemed scared of him. Destiny had to be home by a certain time, and if Ruben called, "Destiny would go running."

On October 9, 2020, when Daquasia made the first firearms purchase, Destiny was with her. Destiny told Daquasia what guns to get and told Daquasia how to fill out the paperwork because Daquasia didn't understand some of the questions. Daquasia's mother was upset that Daquasia had purchased the guns for Destiny. Mercado_000037 at 12:25-50. But, Daquasia believed she was helping her sister, and they were "real close. [Destiny] was my favorite sister." Mercado_005912 at 38:30-38. Daquasia didn't realize that—in the words of law enforcement—she was "being used." Mercado_000037 at 13:30-40. After the first time, Destiny explained the paperwork to Daquasia. Then on October 11, 2020, Destiny told Daquasia what guns to get, and Daquasia went alone to buy them. The same thing happened on October 12 and in December 2020. For all of these purchases, Destiny gave Daquasia the money to buy the guns. Mercado_000037 at 13:00–13:08. December 30, 2020, was the last time Daquasia bought guns for Destiny. Destiny tried to get Daquasia to buy more guns for her, but Daquasia refused. Mercado_000037 at 21:54–22:00. She also started questioning Destiny about what would happen if the guns came back to her since they were in her name. Mercado_000037 at 28:40-57. Destiny just told her to report the guns as stolen. *Id*.

The guns that were recovered in Daquasia's car in April 2021 she purchased for herself for protection. Mercado_000037 at 23:05-17. The apartment in New York that Daquasia

7

shared with her family, which included her children, mother, and her sister and her children, was broken into. Mercado_005912 at 22:00-14. Although Daquasia "didn't really like guns", her family had "no type of protection [and] anything could have happened." *Id.* This "was the only reason" she purchased those firearms. And her mother had scheduled an appointment for Daquasia to get a permit to carry a gun in New York; it was set for April 11, 2021. *Id.* at 29:33–30:19. However, Daquasia admitted that on March 31, 2021, she tried to purchase guns for her brother—but she was denied. She believed he "needed a gun because he got a lot of beef and people be shooting at him." Mercado_000037 at 23:17-35.

A few days after Daquasia attempted to purchase the guns for her brother, things finally boiled over between Daquasia and Destiny. Because of everything going on with the guns and Ruben, things within Daquasia's family had been tense for months. For example, in January 2021, Daquasia, Destiny, and their brother Corey got into an argument. After the fight, Destiny involved Ruben and reported Daquasia to the Administration for Children's Services in New York (ACS). Mercado_005912 at 18:13-30. After their falling out in April 2021, Destiny again reported Daquasia to ACS—this time alleging a sexual assault of Daquasia's daughter by her youngest son's father. He was cleared—but Daquasia's daughter had to go through a forensic interview. Then in July 2021, there was another altercation between Destiny, Daquasia, and her mother, during which Daquasia says Destiny threatened her with a knife. To all the losses and consequences associated with this case, add Daquasia's family.

### V.     **The History and Characteristics of the Defendant Continued**

At the time of the offense, Daquasia had just turned twenty-one years old. Under the recently released 2024 Guidelines, her "youthfulness" can be grounds for a departure:

> A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and

8

> contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.
>
> The age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age. Age-appropriate interventions and other protective factors may promote desistance from crime. Accordingly, in an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing.

USSG § 5H1.1. This Guidelines' Policy Statement, which is one of the 3553(a) factors, formally acknowledges what science has taught us about human development. Our brains don't fully develop until our mid to late twenties. And, the last part of the brain to reach maturity is the prefrontal cortex, which is responsible for "planning, prioritizing, and making good decisions."[1] Moreover, the United States Supreme Court has made clear that "*youth matters in sentencing.*" *Jones v. Mississippi*, 593 U.S. 98, 105 (2021) (emphasis added). Even more so here, because Daquasia had never been involved with the criminal legal system until this case. And her involvement was precipitated by one of the "risk factors" identified by the Guidelines: "familial relationships." USSG § 5H1.1. Thus, at the time of her offense between 2020 and 2021, when Daquasia was twenty-one, her youth unquestionably affected her involvement in this case. But her youth also makes her "more amenable to rehabilitation." *Id.*

Daquasia has already demonstrated her amenability to rehabilitation while on bond. Prior to her arrest in April 2021, Daquasia was a daily marijuana user. After pleading guilty to Possession with Intent to Distribute Marijuana in August 2023, she received a sentence of

---

[1] National Institute of Mental Health, The Teen Brain: 7 Things to Know, https://www.nimh.nih.gov/health/publications/the-teen-brain-7-things-to-know (last visited Feb. 28, 2024).

9

probation. As part of her probation, Daquasia was ordered to attend outpatient drug treatment at Healthy U Behavioral Health Services (HUBHS) in Union, South Carolina. Since then, she's tested positive for marijuana just once—in October 2023. For over a year now, she's been clean and had no other violations of her state probation or federal bond conditions. *See United States v. Schlosser*, 558 F.3d 736, 742 (8th Cir. 2009) ("[P]re-trial conduct, including conduct while free on bond, is an appropriate consideration 'under § 3553(a), because it is relevant to the history and characteristics of the defendant, and to the need for the sentence to promote respect for the law.'" (citation omitted)). Daquasia is still participating in an outpatient treatment group once a week at HUBHS.

## VI.     The Kinds of Sentences Available

Under the federal statute that Daquasia plead guilty to, she is "eligible for not less than 1 nor more than 5 years' probation because the offense is a Class D Felony, pursuant to 18 U.S.C. § 3561(c)(1). One of the following may be imposed as a condition of probation: a fine, restitution, or community service." PSR at ¶ 123. Thus, although the Guidelines recommend imprisonment, *see* USSG § 5C1.1(f), the Guidelines are not mandatory, *Gall*, 552 U.S. at 59. Accordingly, because probation is available under the applicable statute, a nonincarcerative sentence would satisfy the law and be sufficient, but not greater than necessary.

## VII.    PSR Objections

Daquasia has submitted four objections to the PSR. As to the first objection, at issue is Daquasia's eligibility for a 2-level reduction under USSG §2K2.1(b)(9), which provides that

If the defendant—

(A)     receives an enhancement under subsection (b)(5);

(B)     does not have more than 1 criminal history point, as determined under §4A1.1 (Criminal History Category) and §4A1.2 (Definitions and Instructions for Computing Criminal History), read together, before

10

> application of subsection (b) of §4A1.3 (Departures Based on Inadequacy of Criminal History Category); and
>
> (C)  (i) was motivated by an intimate or familial relationship or by threats or fear to commit the offense and was otherwise unlikely to commit such an offense; or (ii) was unusually vulnerable to being persuaded or induced to commit the offense due to a physical or mental condition;
> decrease by **2** levels.

Prior to this case, Daquasia was not involved with the criminal legal system. Thus, at the time of this offense, it wasn't likely that she'd commit any offense, let alone a firearms offense. Further, there is no evidence that Daquasia had ever possessed a firearm, or had any interest in firearms at all, prior to this case. She was only eligible to purchase the types of guns that she bought in this case—handguns from a federally licensed gun dealer—after turning twenty-one. However, under South Carolina and federal law, Daquasia could have purchased handguns from non-federally-licensed gun dealers when she turned eighteen. But she never did. Daquasia did not, four months after turning twenty-one, suddenly become interested in buying handguns from federally licensed gun dealers. She did so because her siblings asked her to. They told telling what guns to buy, where to buy them from, how to fill out the paperwork, and gave her the money to purchase the guns. Daquasia's motivation to commit the offense being her familial relationships is further shown by the fact that she didn't get any money from her siblings to purchase the guns. Under these circumstances, Daquasia is eligible for the two-point reduction under sections 2K2.1(b)(9) because she doesn't have any criminal history points and was motivated by her familial relationships, specifically with her siblings, to commit the offense and was otherwise unlikely to have committed such an offense.

As to the fourth objection, for the same reasons mentioned above—and others—Daquasia was a minimal or minor participant under USSG §3B1.2(a) or USSG §3B1.2(b). "In determining whether to apply subsection (a) or (b), or an intermediate adjustment," the

11

Guidelines outline several factors the Court should consider. First, at the time Daquasia committed the offense, she did not know where the guns she purchased for Destiny would end up. Daquasia did not learn until early 2021, between January and February, that Destiny gave the guns Daquasia purchased for Destiny to Ruben. Thus, she had a limited understanding of the scope and structure of the criminal activity. *See* USSG § 3B1.2, comment. (n.3(C)(i) ("the degree to which the defendant understood the scope and structure of the criminal activity")). Daquasia also didn't participate in planning or organizing the criminal activity, *see id.* at (n.3(C)(ii)), nor did she "exercise[] decision-making authority or influence[] the exercise of decision-making authority," *id.* at (n.3(C)(iii)). Daquasia purchased the guns for Destiny at Destiny's request. Destiny did not tell Daquasia what Destiny was going to do with the guns. And a few months after Daquasia told Destiny that she wouldn't buy any more guns for her, they were no longer on speaking terms. Next, "the nature and extent" of Daquasia's "participation in the commission of the criminal activity" was abbreviated and limited. *See id.* at (n.3(C)(iv)). Daquasia bought eleven guns for Destiny between October 9-12, 2020, and on December 21 and 30, 2020. Destiny didn't pay her to make these purchases. Comparatively, Destiny bought sixty-six firearms over the course of a year, between January 2020 and January 2021. For those guns, Destiny was paid over $20,000 by Ruben. Thus, Daquasia also didn't "st[and] to benefit from the criminal activity." *See id.* at (n.3(C)(v)). The opposite is true. As previously mentioned, Destiny didn't pay Daquasia to buy the guns for Destiny. And she's now a convicted felon. Accordingly, Daquasia is at least less culpable than her codefendants.

### VIII. Conclusion

While Daquasia's familial relationships motivated her to commit the offense she plead guilty to, that only explains why Daquasia did what she did. It does not excuse it—as Daquasia said in her letter to the Court, "there is no excuse." *See* Ex. 3. But in determining

the appropriate sentence under 18 U.S.C. § 3553(a), the explanation matters. And so does Daquasia's age. And who she is as a mother. And a daughter. *See* Exhibits 4-5, Hilda Byrd Letter to the Court, Neriyah Clark Letter to the Court. And, maybe most importantly, who she still can be—as a person. Her involvement in the criminal legal system has not only changed her status, but it has also taught her invaluable lessons, albeit in one of the hardest ways. Because of this education, Daquasia is no longer the twenty-one-year-old who bought guns for her siblings. She's different, but better. Accordingly, Ms. Daquasia Mercado requests that the Court grant this Motion for Downward Variance, and impose a nonincarcerative sentence.

                                       Respectfully submitted,

                                       BY: *s/Judea S. Davis*
                                       Judea Shechinah Davis (D.S.C. Fed. Bar #13440)
                                       Assistant Federal Public Defender
                                       75 Beattie Place, Suite 950
                                       Greenville, South Carolina 29601
                                       (864) 235-8714
                                       judea_davis@fd.org

Greenville, SC
November 13, 2024